1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SIERRA SNOWMOBILE                  No. 2:21-cv-01913-DJC-SCR
     FOUNDATION, et al.,
12

13              Plaintiffs,            ORDER

14   v.

15   UNITED STATES FOREST SERVICE, et
     al.,
16

17              Defendants,

18   WILDEARTH GUARDIANS, et al.,

19              Intervenor-
                Defendants.
20

21        This case concerns environmental protection policies, including plans that

22   reduced the acreage open to over-snow vehicles ("OSVs"), in the Stanislaus National

23   Forest.  Plaintiffs challenge the underlying analysis and actions behind the federal

24   government's issuance of the Stanislaus National Forest Over-Snow Vehicle Use

25   Designation Record of Decision ("the Decision"), which significantly reduced the

26   acreage open to cross-country motorized OSV use from that previously and

27   historically available to recreationists in the Forest.  Intervenor Defendants challenge

28   some elements of Defendants' decision making, while also supporting other elements

1

1    of Defendants' actions.  The Court finds that Defendants complied with the relevant

2    environmental statutes in issuing the Decision and rejects both Plaintiffs' and

3    Intervenor Defendants' claims.

4    **FACTS AND PROCEDURAL BACKGROUND**

5         The Stanislaus National Forest encompasses 898,099 acres on the western

6    slope of the Sierra Nevada mountain range ranging in elevation from 1,500 to over

7    11,000 feet above sea level.  (ECF No. 1, Compl., ¶ 34.)  Almost 215,000 acres within

8    the Stanislaus National Forest are designated Wilderness Areas under the Wilderness

9    Act of 1964, 16 U.S.C. §§ 1131, *et seq*., and are closed to all motorized travel.  (*Id.*)

10    The Stanislaus National Forest also includes 100,299 acres of Near Natural

11    management areas and 23,107 acres of Proposed Wilderness management areas,

12    both of are designated as nonmotorized spaces.  (*Id.*)  Although the Stanislaus Forest

13    Plan provides for Near Natural and Proposed Wilderness areas to be managed as

14    semi-primitive nonmotorized, they were never formally closed to OSV use and have

15    been historically used by OSV riders.  (*Id.*)

16         The Stanislaus National Forest is a destination for a variety of winter recreation

17    activities, including backcountry snowmobiling.  (*Id.* ¶ 36.)  Prior to the Decision, the

18    Forest Service permitted cross-country OSV use in the Stanislaus National Forest

19    wherever there was adequate snowfall in areas that allowed for motorized use and in

20    some Near Natural and Proposed Wilderness areas.  (*Id.*)  This included areas below

21    5,000 feet in elevation.  (*Id.*)

22         OSV usage can cause damage to the natural environment.  The vehicles

23    compact, rut, and erode soil, particularly in wet meadow areas or at the beginning and

24    end of the winter season when snow levels are lower.  AR 000404; AR 003344–45; AR

25    0003763.  Snow compaction from OSV usage can influence local hydrology by

26    delaying snowmelt and run off.  AR 003345; AR 003351.  OSVs can also damage

27    vegetation under the snow if there is not adequate snow cover, and exhaust emissions

28    or leaked fuels can infiltrate soils or local bodies of water, degrading those resources

1  and affecting the biodiversity that depends on them.  AR 003345–46; AR 003351; AR

2  001675–76.

3      Local wildlife can also be directly impacted by OSV use.  Animals may flee when

4  they detect the presence of an OSV, causing them to exert energy (which may be

5  significant for predatory species).  AR 000525; AR 004068.  Some wildlife avoid areas

6  where OSVs are typically present all together, reducing those species' winter home

7  range and potentially displacing them from preferred habitat for feeding, sheltering,

8  or reproducing.  AR 000525; AR 004067.  Relatedly, OSVs cause noise and visual

9  disturbances that affect animals, and the compacted snow trails they leave behind can

10  allow predators such as coyotes or bobcats to enter into new territories where their

11  prey species are sheltered.  AR 000525–26; AR 004067–69.  The vehicles can also

12  suffocate animals beneath the snow or otherwise destroy the habitat of wildlife that

13  inhabit the subnivean space between the snow and the ground.  AR 000525; AR

14  004068.

15      The Stanislaus Forest Plan Direction, implemented by the United States Forest

16  Service, requires a minimum of twelve inches of snow depth for cross-country OSV use

17  but does not specify a minimum snow depth for OSV travel on existing trails.  (ECF No.

18  1 ¶ 38.)  Conditions on existing OSV trails vary considerably throughout the Stanislaus

19  National Forest in both the level of snow compaction and the underlying ground

20  conditions, fluctuating to be greater than or less than the twelve-inch minimum snow

21  depth.  (*Id.*)  Recognizing the "need to provide a manageable, designated OSV system

22  of trails and areas within the Stanislaus National Forest that is consistent with and

23  achieves the purposes of the Forest Service Travel Management Rule," the Forest

24  Service issued a Notice of Intent to Prepare an Environmental Impact Statement ("EIS")

25  for a proposal to designate OSV use on roads, trails, and areas and identify trails for

26  grooming within the Stanislaus National Forest.  (*Id.* ¶ 39; 80 Fed. Reg. 36760 (June

27  26, 2015).)  During the 45-day scoping period required under the National

28  Environmental Policy Act ("NEPA") to gather internal and external input, the Forest

3

1  Service received over 100 responses regarding its proposal to designate areas and

2  trails in the Stanislaus National Forest for OSV use.  (ECF No. 1 ¶ 39.)

3       In August 2018, the Forest Service released the Draft Environmental Impact

4  Statement ("DEIS") for the Stanislaus National Forest OSV Use Designation project

5  ("Project").  (*Id*. ¶ 40.)  The DEIS analyzed five alternatives to meet the project purpose

6  of providing "for a system of NFS ["National Forest System"] roads, NFS trails, and

7  areas on NFS lands that are designated for over-snow vehicle use where snowfall is

8  adequate for that use to occur."  (*Id*.)  All the alternatives imposed a minimum snow-

9  depth requirement of at least twelve inches for both cross-country and trail OSV use.

10  (*Id*.)  Alternative 1 was the proposed action in the scoping notice with minor

11  modifications.  AR 001404, 001407–09.  Alternative 2 was the "No-Action Alternative,"

12  in which there would be no change to the way the Forest Service currently manages

13  public OSV use on the Forest.  AR 001409.  Alternative 3 emphasized opportunities

14  for non-motorized winter recreation.  AR 001410.  Alternative 4 emphasized

15  motorized use.  AR 001411.  Alternative 5 was designated as the preferred alternative,

16  which emphasized protections for wildlife and natural resources as well as recreation

17  opportunities for motorized and non-motorized vehicle users.  AR 001411.

18       The Forest Service issued the Final Environmental Impact Statement ("FEIS")

19  and draft Record of Decision ("Draft ROD") in March 2019.  (ECF No. 1 ¶ 47.)  All the

20  alternatives assessed in the FEIS assumed that there was no land below 5,000-feet

21  elevation available for OSV use.  (*Id*. ¶ 49.)  Forest Supervisor Jason Kuiken signed the

22  final Record of Decision ("Final ROD") in July 2021.  (*Id*. ¶ 56.)  The Final ROD adopted

23  many aspects of Alterative 5, including the Minimum Snow Depth Requirements,

24  Seasons of Use Designations, Temporary Witner Stream Crossing, OSV-use trail

25  designations (both non-groomed and those available for grooming), and the OSV-use

26  designations within the Mi-Wok, North Highway 4, and Spicer OSV-use areas.  (*Id*.)

27  The Final ROD also includes OSV-use designations in the Alpine, Alpine East, Eagle,

28

1    Highway 108, and Highway 108 East OSV-use areas which differ from Alternative 5.

2    (*Id.*)

3            Plaintiffs are the Sierra Snowmobile Foundation, BlueRibbon Coalition, Inc.,

4    American Council of Snowmobile Associations, Inc., Jeff Wittman, Mary Krupka, and

5    Jeff Watts, a collection of individuals and organizations whose members use OSVs to

6    access Stanislaus National Forest.  (ECF No. 40 ¶¶ 3, 9–12.)  Federal Defendant is the

7    United States Forest Service.  (ECF No. 42 at 1.)  Forest Supervisor for the Stanislaus

8    National Forest Jason Kuiken is also a named Defendant and is sued in his official

9    capacity.  (*Id.*)  Intervenor Defendants are environmental organizations WildEarth

10   Guardians and California Wilderness Coalition.  (ECF No. 41 at 1.)

11           Plaintiffs bring five claims.  First, Plaintiffs allege that Defendants failed to

12   adequately consider environmental impacts in violation of NEPA.  (ECF No. 1 ¶¶ 63–

13   66.)  Second, Plaintiffs allege that Defendants failed to meet the purpose and need of

14   the Project, also in violation of NEPA.  (*Id.* ¶¶ 67–72).  Third, Plaintiffs allege that

15   Defendants violated the National Forest Management Act ("NFMA"), 16 U.S.C.

16   §§ 1600, *et seq*., by issuing a Decision that is inconsistent with the Stanislaus Forest

17   Plan.  (*Id.* ¶¶ 73–77.)  Fourth, Plaintiffs allege that Defendants violated both NEPA and

18   NFMA by proffering an inadequate scientific basis in the evaluation of environmental

19   effects.  (*Id.* ¶¶ 78–82.)  And fifth, Plaintiffs allege that Defendants violated the Travel

20   Management Rule by arbitrarily applying its minimization criteria.  (*Id.* ¶¶ 83–87.)

21   While Intervenor Defendants support the Forest Service's conclusions on imposing a

22   twelve-inch snow threshold for OSV usage, they assert that the Forest Service's

23   Decision does not sufficiently protect four species – the Sierra Nevada Red Fox, Pacific

24   Marten, Sierra Nevada Yellow-Legged Frog, and Yosemite Toad – from OSV use.

25   (ECF No. 41 at 16.)  Intervenor Defendants claims are raised under NEPA; they do not

26   raise any claims under the Endangered Species Act.

27           Plaintiffs request that this Court: (1) Enter judgment in favor of Plaintiffs on all

28   claims for relief raised in the Complaint; (2) Declare unlawful and set aside the

1    Decision; (3) Remand the Decision for further analysis and action in accordance with

2    applicable law; (4) Enjoin the Defendants from relying on, implanting, or enforcing the

3    Decision, including without limitation any of the OSV use designations or restrictions

4    in the Decision pending the Defendants' completion and circulation of an

5    environmental document and new Decision complying in full with the requirements of

6    NEPA, NFMA, and the Administrative Procedure Act ("APA"); (5) Award Plaintiffs its

7    costs, including reasonable attorney's fees, pursuant to the Equal Access to Justice

8    Act, 28 U.S.C. §§ 241, *et seq*., Federal Rule of Civil Procedure 54, and any other

9    applicable rule or statute, and; (6) Provide such further relief as is just and that this

10    Court may require.  (ECF No. 1 at 21–22.)

11        The Complaint was filed on October 13, 2021, and was assigned to Judge John

12    A. Mendez.  (ECF No. 1.)  Plaintiffs moved for summary judgment on June 20, 2022.

13    (ECF No. 40.)  Intervenor Defendants moved for summary judgment on July 29, 2022.

14    (ECF No. 41.)  Defendants moved for summary judgment on August 29, 2022.  (ECF

15    No. 42.)  The case was reassigned to Judge Troy L. Nunley on December 21, 2022.

16    (ECF No. 48.)  The case was then reassigned to Judge Daniel J. Calabretta on April 4,

17    2023 (ECF No. 50).  The matter is fully briefed.

18                                    **LEGAL STANDARD**

19        Ordinarily, summary judgment is appropriate under Rule 56 where the moving

20    party "shows that there is no genuine dispute as to any material fact and the movant is

21    entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, "[i]n a case

22    involving review of a final agency action under the Administrative Procedure Act . . .

23    the standard set forth in Rule 56(c) does not apply because of the limited role of a

24    court in reviewing the administrative record."  *Sierra Club v. Mainella*, 459 F. Supp. 2d

25    76, 89 (D. D.C. 2006).  "A court conducting APA judicial review does not resolve

26    factual questions, but instead determines 'whether or not as a matter of law the

27    evidence in the administrative record permitted the agency to make the decision it

28    did.'"  *Conservation Cong. v. U.S. Forest Serv.*, No. 2:12-CV-02800-TLN, 2014 WL

1    2092385, at *4 (E.D. Cal. May 19, 2014) (quoting *Mainella*, 459 F. Supp. 2d at 90).  In a

2    case brought under the APA, summary judgment is the "mechanism for deciding, as a

3    matter of law, whether the agency action is supported by the administrative record

4    and otherwise consistent with the APA standard of review." *Id.*

5         Because NEPA and NFMA – the statutes which Plaintiffs and Intervenor

6    Defendants allege Defendants violated – do not allow a private right of action, the

7    agency's decisions is reviewed under the APA.  *Native Ecosystems Council v. U.S.*

8    *Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005).  Under the APA, a decision may be

9    set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in

10   accordance with law." *Id.*; *see* 5 U.S.C. § 706(2)(A).  Such review "is narrow and a court

11   is not to substitute its judgment for that of the agency." *Motor Vehicle Mfgrs. Ass'n v.*

12   *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Accordingly, a court may only

13   set aside a decision if the agency "has relied on factors which Congress has not

14   intended it to consider, entirely failed to consider an important aspect of the problem,

15   offered an explanation for its decision that runs counter to the evidence before the

16   agency, or is so implausible that it could not be ascribed to a difference in view or the

17   product of agency expertise." *Id.*

18                                    **DISCUSSION**

19        Plaintiffs argue that the Forest Service violated NEPA by failing to establish an

20   accurate environmental baseline for the No Action Alternative and by failing to

21   consider a reasonable range of alternatives.  Plaintiffs further assert that the Forest

22   Service violated NEPA by failing to adequately consider public comments on the DEIS.

23   Additionally, Plaintiffs argue that the Forest Service failed to adequately consider

24   environmental impacts in violation of NEPA and the Travel Management Rule,

25   specifically by not using adequate scientific information, arbitrarily and capriciously

26   applying the minimization criteria, and improperly analyzing and supporting site-

27   specific conclusions to exclude areas from OSV use.  Finally, Plaintiffs argue that the

28   Decision failed to use required adequate scientific information in amending the Forest

                                        7

1  Plan.  Intervenor Defendants defend elements of the Forest Service's analysis, but levy

2  their own claims against the agency under NEPA regarding four species listed under

3  the Endangered Species Act.

4  **I.      Standing**

5        As an initial matter, the Court must address whether Plaintiffs have standing to

6  bring the instant claims.  The Court notes that neither Defendants nor Intervenor

7  Defendants contest Plaintiffs' standing.  (*See generally*, ECF Nos. 41, 42.)  Regardless,

8  Plaintiffs satisfactorily demonstrate that they have standing to bring their claims under

9  Article III of the U.S. Constitution.

10       For a party to have organizational standing under Article III, it must establish

11  that: (1) it has suffered an injury in fact; (2) caused by the opposing party; and (3) the

12  Court is able to provide redress.  *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61

13  (1992).  Plaintiffs have met these requirements.  First, Plaintiffs' members who

14  regularly use OSVs within the Forest have had their access restricted, limiting their

15  actions and enjoyment of the Forest.  This constitutes an injury.  *See Idaho State*

16  *Snowmobile Ass'n v. U.S. Forest Serv.*, No. 1:19-CV-00195-DCN, 2021 WL 493412, *7–

17  8 (D. Idaho Feb. 10, 2021).  Second, it is clear that the restrictions on Plaintiffs'

18  members are caused by the Decision, which was promulgated by the Forest Service, a

19  defendant in this case.  And third, this Court is enabled to find a federal agency's

20  actions noncompliant with environmental statutes and the APA, and therefore, can

21  provide redress should the Court deem doing so appropriate.  Thus, Plaintiffs have

22  satisfied its requirements of showing standing and the Court will proceed to review

23  the case.

24  **II.     The Forest Service's Approach to NEPA Alternatives**

25       "[A]n EIS's selection and discussion of alternatives fosters informed decision-

26  making and informed public participation" and is critical to a court's review of agency

27  actions under NEPA.  *State of Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982).  "The

28  existence of a viable but unexamined alternative renders an environmental impact

1    statement inadequate." *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057

2    (9th Cir. 1985).  But an agency need not consider "alternatives which are infeasible,

3    ineffective, or inconsistent with the basic policy objectives for the management of the

4    area."  *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1180

5    (9th Cir. 1990).

6        Plaintiffs' allegation that the Forest Service violated NEPA by failing to meet

7    requirements related to project alternatives has two components: (1) that the Forest

8    Service did not establish an accurate environmental baseline for the No Action

9    Alternative; and (2) that the Forest Service failed to consider an appropriate range of

10   alternatives.

11        **A.  Environmental Baseline for the No Action Alternative**

12        Plaintiffs argue that the Forest Service failed to accurately determine where

13   snowmobiling occurred historically and under what conditions and to disclose this

14   information to the public, despite public comments providing this information to the

15   agency.  (ECF No. 40 at 13.)  Without these data points, Plaintiffs assert that the Forest

16   Service could not have properly established an environmental baseline for the No

17   Action Alternative.  More specifically, Plaintiffs' position is that the Forest Service

18   improperly assessed a baseline alternative because it: (1) incorrectly defined the

19   Forest area historically open to OSV travel as excluding all areas below 5,000 feet; and

20   (2) incorrectly concluded that a twelve-inch minimum snow-depth for OSV trail use

21   exists under the Plan Directive.  (ECF No. 40 at 13.)  The Forest Service contests this,

22   arguing that its comparison of historic and regular OSV use with the acreage

23   designated as open to OSV use in the action alternatives satisfied its requirements to

24   establish a baseline under NEPA.

25        In weighing alternatives, an agency must typically consider a "No-Action"

26   alternative because it provides a benchmark against which the action alternatives are

27   evaluated.  *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 623 F.3d 633, 642

28   (9th Cir. 2010).  "Without establishing the baseline conditions which exist before a

1   project begins, there is simply no way to determine what effect the project will have

2   on the environment and, consequently, no way to comply with NEPA." *Great Basin*

3   *Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (cleaned up).

4   "An agency need not conduct measurements of actual baseline conditions in every

5   situation . . . [b]ut whatever method the agency uses, its assessment of baseline

6   conditions 'must be based on accurate information and defensible reasoning.'" *Id.*

7   (quoting *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016)).

8          The FEIS concludes that no OSV use has historically occurred below 5,000 feet

9   in elevation, and therefore, excluded those areas of the Forest that were below that

10  point from its baseline.  AR 000357–59.  It states that "[a]cres located above 5,000 feet

11  were considered a surrogate for lands that commonly receive at least 12 inches of

12  snow annually," AR 000311, but qualified that answer by noting that the 5,000-foot

13  elevation "is by no means a hardline" requirement in relation to snow depth and is

14  more comparable to "a screening tool."  AR 000350.  The Forest Service views the

15  5,000 feet of elevation as a malleable cutoff between areas that consistently received

16  twelve inches of snow and areas that did not, or in other words, areas that could

17  consistently support OSV use and areas that could not.  *See id.*  The exclusion of these

18  areas resulted in over 300,000 acres not being considered for OSV use in the No

19  Action Alternative, including land below 5,000 feet in elevation.  AR 000357–58.

20         While the Court finds the issue to be a close one, the Court concludes that the

21  Forest Service has adequately justified the exclusion of areas in the Forest under 5,000

22  feet or that do not receive twelve inches of snow from OSV use.  The twelve-inch

23  minimum was previously used as a threshold for cross-country OSV use.  AR 011518

24  ("Designated OSV Routes: include roads, routes and trails which are open to

25  motorized use. Cross-country over snow travel, by vehicles designed specifically for

26  that purpose, will be permitted when there is 12 inches or more of snow and no

27  contact is made with native soil or vegetation.")  In addition, the State of California had

28  applied that same threshold for grooming trails.  AR 000371 ("Initial grooming of trails

1   (first grooming of the year) shall only occur when there is 18 inches or more of snow

2   present to ensure that no contact with native soil or vegetation occurs or the trail or

3   underlying road surface is not disturbed. All subsequent grooming shall occur only

4   when there is 12 or more inches of snow present.").  And in reaching the twelve-inch

5   threshold for cross-country use, the Forest Service looked at other potential

6   benchmarks and scientific data.  *See* AR 011056–73 (identifying and discussing

7   scientific data available to the Forest Service); *see also* AR 000345–AR 000348

8   (discussing merits of a twelve-inch threshold).

9        While a Forest Service scientist noted that "[t]here's not a lot of literature out

10  there," and documented difficulties in obtaining "all of the original literature sources"

11  concerning appropriate snow-level thresholds, AR 011061–62, the Forest Service

12  appeared to rely on the data it could find.  That includes *California State EIR Over*

13  *Snow Vehicle Program Draft Environmental Impact Report Program Years 2010 – 2020*,

14  which repeatedly acknowledges a twelve-inch snow threshold.  AR 011059–60 (noting

15  a depth for off-trail OSV use of twelve inches and that: "In most of the 11 national

16  forests in the Project Area, grooming of trails would occur only when there is at least

17  12 inches of snow on the ground (Eldorado, Stanislaus, and Inyo National Forests

18  require a minimum of 18 inches, and Sequoia National Forest requires a minimum of

19  24 inches). These routes are used all year, and plants do not grow on the paved and

20  gravel roads and dirt trails comprising the groomed trail system. If plants were to take

21  root along these routes, the 12 inches of snow would protect them from grooming.").

22  That document also expresses that "[e]ducational materials shall include information

23  that discourages OSV travel over bare ground, exposed vegetation, and snow less

24  than 12 inches deep, including a description of the special-status plant species

25  potentially affected and the adverse effects on those species."  AR 011062.  So, while

26  the body of data relied on by the Forest Service does not appear to be extensive, the

27  record supports that the agency's decision-making process acknowledges the

28  shortfalls in data available to the agency and still appears to be, at least minimally,

1    guided by available literature.  The agency's experts then unanimously agreed that

2    the twelve-inch threshold was the best option.  AR 000384 ("Forest resource

3    specialists unanimously agreed that designating a minimum snow depth requirement

4    in order to allow OSV use to occur was mutually beneficial and provided a means in

5    which to minimize the likelihood of resource damage occurring as a result of OSV

6    use.").

7         Moreover, the environmental baseline can be an estimation.  The Forest Service

8    "need not conduct measurements of actual baseline conditions in every situation–it

9    may estimate baseline conditions using data from a similar area, computer modeling,

10   or some other reasonable method."  *Great Basin Res. Watch*, 844 F.3d at 1101.  Here,

11   the 5,000-foot threshold appears reasonable to the Court.  While Plaintiffs identify two

12   years, 2017 and 2019, where sufficient snow fall fell below 5,000 feet, those years

13   appear to be outliers and would properly be excluded from a baseline assessment.

14   (*See* ECF No. 40 at 15.)  That is, the 5,000-foot threshold seems to be a reasonable

15   point at which to distinguish altitudes at which snow consistently falls at a level that

16   can support OSV use from a level in which OSVs cannot be used regularly due to lack

17   of snowfall.

18        Plaintiffs' reliance on cases such as *Oregon Natural Desert Association v. Rose*,

19   921 F.3d 1185, 1188, 1190–91 & 1191 n.4 (9th Cir. 2019) and *Great Basin Resources*

20   *Watch v. Bureau of Land Management*, 844 F.3d at 1103, is misguided.  In *Oregon*

21   *Natural Desert Association*, plans were deemed improper because the decision made

22   by the agency lacked a reasonable foundation and contradicted available expert data.

23   921 F.3d at 1191.  And in *Great Basin Resources Watch*, the agency offered no

24   explanation at all of its agency's reasoning.  844 F.3d at 1103.  Here, while it is true

25   that the Forest Service could have more robustly outlined its reasoning, it at least

26   offers some support for its conclusions.  Further, Plaintiffs do not identify available

27   expert data that meaningfully contradicts the Forest Service's decision making.

28   Instead, Plaintiffs rely on two years of significant snowfall outside of the Forest

1    Services' threshold.  Two years of potentially outlier data does not convince the Court

2    that the Forest Service's conclusions regarding the 5,000-foot cutoff between areas

3    that consistently receive twelve inches of snow and areas that do not is unreasonable.

4    Nor will the Court interpret those two years of outlier data as contradictory to the

5    Forest Service's conclusions.

6        Plaintiffs also point to language in the Forest OSV Use Designation Draft

7    Recreation Report that they maintain shows that the Forest Service's decision was

8    unsupported.  First, Plaintiffs note that the draft report improperly points to data from

9    Tahoe National Forest, rather than Stanislaus National Forest.  AR 003660 ("Lower

10   elevations generally have less OSV use – snow occurs at lower elevations less

11   frequently and does not persist for long periods of time (2 to 5), 5,000 feet and below

12   for the Tahoe." (emphasis added).)  But significantly, that is a draft document.

13   Plaintiffs attempts to tie that incorrect language to the FEIS, noting that the FEIS

14   adopts "this same language."  (ECF No. 40 at 14–15.)  But the critical language that

15   would give this Court cause for concern – language indicating the data is from Tahoe

16   rather than Stanislaus, has been amended to say: "Lower elevations generally have

17   less OSV use – snow occurs at lower elevations less frequently and does not persist for

18   long periods of time (2 to 5 days), approximately 5,000 feet and below for the

19   Stanislaus."  AR 000419 (emphasis added).  While the Court understands the concern

20   that this may not have been a typographical error in the draft document but rather

21   improper use of information from a different region, there is nothing in the record

22   indicating that the information in the final document is inaccurate.

23       Plaintiffs then attack the twelve-inch snow threshold for OSV trails, which they

24   view as distinguishable from OSV cross-country use.  (*See* ECF No. 41 at 17–19.)  The

25   Forest Service stated that it reached its twelve-inch minimum, which applied to both

26   OSV trails and cross-country use, after "Forest resource specialists unanimously

27   agreed that designating a minimum snow depth requirement to allow OSV use to

28   occur was mutually beneficial and provided a means in which to minimize the

1   likelihood of resource damage occurring as a result of OSV use."  AR 000384; *see* AR

2   000346–47 (discussing similar reliance on scientific experts to support the twelve-inch

3   threshold).  Plaintiffs assert that "the Forest Service has previously informed the public

4   that only '6 inches of packed snow' was necessary for OSV trails [sic] use in the Forest."

5   (ECF No. 40 at 17 (quoting AR 011071).  But that focus on six inches of packed snow is

6   distinguishable from the Forest Services' general requirement that there be twelve

7   inches of snow because those six inches must be <u>packed</u>, necessarily requiring more

8   snowfall that an unpacked six inches.  Indeed, as Plaintiffs tacitly acknowledge, ECF

9   No. 41 at 17, the Forest Service recognizes that these are two different metrics for

10  understanding OSV use.  AR 011071 ("There has to be at least a foot of snow <u>or</u> 6

11  inches of packed snow.") (emphasis added).  It was not arbitrary or capricious to

12  choose one of the metrics that had been historically employed to determine when

13  there was sufficient snow for OSV trail use.

14      Moreover, the administrative record supports the use of a uniform twelve-inch

15  minimum snow depth on trails.  For example, the 2012 Calaveras Snow Trail

16  Maintenance Decision Memo, which governs specific trail usage in the Forest, directs

17  the Forest Service to "[o]nly permit OSV use on the groomed trail system and adjacent

18  concentrated-use riding areas where there is sufficient snow cover (minimum snow

19  depth of 12 inches) to protect soil and vegetation."  AR 011443.  And the Summit

20  Snow Trail Maintenance Decision Memo, which also governs specific trail usage in the

21  Forest also defines "sufficient snow cover . . . to protect soil and vegetation" as being

22  "12 inches." AR 011419.  Indeed, the Forest Service has historically interpreted its

23  regulations as allowing "snowmobile use anywhere there is 12 inches of snow that is

24  not in restricted areas." AR 0011404.  The Court gives significant weight to the Forest

25  Service's history of applying a twelve-inch snow threshold on OSV trails and the

26  agency's interpretation that twelve-inches is an appropriate threshold to balance both

27  use of OSVs and environmental protection. *Nat'l Ass'n of Home Builders v. Defs. of*

28  *Wildlife*, 551 U.S. 644, 672 (2007) ("An agency's interpretation of the meaning of its

1   own regulations is entitled to deference unless plainly erroneous or inconsistent with

2   the regulation.") (internal quotations and citation omitted).

3       And, as mentioned earlier, the Forest Service's determination of twelve inches

4   of snow limitation for OSV use in trails and cross country was devised by scientific

5   experts. *See, e.g.*, AR 011061–62. Further, the twelve-inch threshold, while a specific

6   number, is congruent with the very recommendation advanced by Plaintiffs, which

7   would be for a standard that encompasses an "a layer of dense, packed snow, or

8   deeper fresh snow sufficient to support your vehicle, and prevent damage to forest

9   resources" (although Plaintiffs did indicate a preference for not having a specific

10  number as employed here). *See* AR 005636–37; AR 005657. Plaintiffs have not

11  demonstrated to the Court that the Forest Service's threshold is arbitrary and

12  capricious. Indeed, that threshold is supported by scientific experts and aligns with

13  the underlying goals of the recommendation advanced by Plaintiffs themselves.

14      The Court concludes that neither the Forest Service's environmental baseline

15  referencing 5,000 feet of altitude nor the twelve-inch snow threshold as applied to

16  OSV use on trails or cross country is arbitrary and capricious. Both the baseline and

17  threshold are supported by reasonable and scientific underpinnings and do not

18  violate NEPA. The Court emphasizes that this baseline was constituted by policies that

19  have been enacted and followed for some number of years before the Decision itself

20  was formally implemented. To cast the Decision as a radical departure from policies

21  governing the Stanislaus Forest is simply not an accurate depiction of the Forest

22  Service's actions.

23      **B. Range of Reasonable Alternatives**

24      Plaintiffs next assert that the Forest Service failed to consider a reasonable

25  alternative that included a minimum snow depth that was less than twelve inches for

26  either OSV cross-country or trail use. (ECF No. 40 at 19.) The alternatives considered

27  in the FEIS employ this twelve-inch threshold. The arguments levied by Plaintiffs here

28  mirror those in the preceding section, namely that the twelve-inch threshold itself was

1  arbitrarily and capriciously decided, and therefore, consistent reliance on it is

2  improper.

3      To bolster its claim that the twelve-inch threshold is not supportable, Plaintiffs

4  point to a study identified in the FEIS – Holecek 1974 – which found that three inches

5  could be sufficient to limit damage to underlying vegetation from OSVs, a sharp

6  contrast to the Forest Service's twelve-inch threshold.  *See* AR 000346–57.  But as

7  Plaintiffs' briefing acknowledges, the FEIS explicitly notes that the Holecek 1974 study

8  focused largely on "non-forest species," which the Court presumes are different from

9  the species found in Stanislaus National Forest.  *See id.*  Although mentioned briefly in

10  the FEIS, the Holecek 1974 study appears to be distinguishable, and the Court

11  declines to view it as contradictory data that would undermine the Forest Service's

12  twelve-inch threshold.  Other than identifying this study, Plaintiffs provide no new

13  arguments not already discussed by the Court regarding the actual measurement

14  twelve-inch threshold, and the Court again declines to view that threshold as arbitrary

15  and capricious.

16      Separately, Plaintiffs argue that the twelve-inch threshold is incongruent with

17  the Forest Service's stated goal, which the FEIS defines as:

18

19      establish[ing] a manageable system of NFS trails and areas on NFS lands
    for OSV use in the Stanislaus National Forest to: provide access, ensure
20      that OSV use occurs when and where there is adequate snow for that use
    to occur, promote the safety of all users, enhance public enjoyment,
21      minimize impacts to natural and cultural resources, and minimize
    conflicts among the various uses of NFS lands.
22

23  AR 000338.  Plaintiffs' argument appears to be that, because there may be some

24  instances where OSVs can be operated under conditions of twelve inches of snow, the

25  twelve-inch threshold does not appropriately advance the FEIS' purpose of ensuring

26  that proper OSV use can occur.  This argument is in part premised on Plaintiffs'

27  observation that the Decision permits OSV use in less than 34% of the area that has

28  historically been available.  (*See* ECF No. 40 at 22.)  But the FEIS addresses this, noting

1    that its previous iteration (the DEIS) included "more acres as available for OSV use

2    than what constitutes the true existing condition."  AR 000357.  That is, the DEIS

3    portrayed "all NFS lands existing outside of wilderness as available for OSV use,"

4    including land that could not actually be used for OSV use, such as areas below 5,000

5    feet, developed recreation sites (e.g., ski resorts), land subject to other management

6    plans that restrict OSV use, and Proposed Wilderness areas that similarly restrict OSV

7    use.  *Id.*  If anything, considering as part of a baseline land that could not possibly be

8    used for OSV use would itself have been arbitrary and capricious.  Regardless, the

9    Forest Service's conclusion that the twelve-inch threshold properly supports

10    environmental protection while maintaining appropriate levels of OSV aligns with the

11    stated goal as outlined in the FEIS.  Accordingly, the Court finds that the Forest

12    Service did not err by failing to consider an alternative that had a threshold other than

13    the twelve-inch snow threshold.

14    **III.    The Forest Services' Responses to Public Comments**

15        Plaintiffs next argue that the Forest Service violated NEPA by failing to

16    adequately consider and respond to public comments on the DEIS.  (ECF No. 40 at

17    23–25.)  Council for Environmental Quality regulations enforceable at the time the

18    DEIS was published require that the Forest Service request comments from the public,

19    affirmatively soliciting comments from those persons or organizations who may be

20    interested or affected by the proposed action.  *Or. Nat. Res. Council v. Marsh,* 52 F.3d

21    1485 (9th Cir. 1995), *as amended on denial of reh'g* (June 29, 1995); 40 C.F.R.

22    § 1503.1(a)(4).  Plaintiffs' arguments here again relate to their objection to the 5,000

23    foot elevation and twelve-inch show depth threshold, asserting that they and others

24    provided public comments to the Forest Service that "identified the incorrect DEIS

25    information about the 5,000-foot elevation cutoff and the overbroad application of a

26    12-inch minimum snow depth requirement (especially as to OSV trails versus OSV

27    cross-country use), and other items."  ECF No. 40 at 23; *see, e.g.,* AR 005636–67, AR

28    005642.  The specific documents identified by Plaintiffs are as follows:

- "[Sierra Snow Foundation] commented that the 'use of 5,000 ft elevation as the standard by which to evaluate suitable OSV terrain is specious' and does not reflect actual conditions in the Forest."  ECF No. 40 at 24; *see* AR 005642.

- "[Sierra Snow Foundation] provided examples of significant snow accumulation below 5,000 feet in elevation in its comment letter (AR005642) and in the Forest Service's pre-decisional objection process."  ECF No. 40 at 24; *see* AR 004410–14.

- "The Forest Service in the FEIS responded that '5,000 feet was not considered a hard cut off,' AR000073, 000098, and that it had considered allowing OSV use to occur below 5,000 feet when adequate snow occurred, but ultimately did not do so because 'resource specialists determined that it is in low elevation areas, that receive intermediate and very rare snowfall events or accumulation where resources are most vulnerable.'"  ECF No. 40 at 24; *see* AR 000073, AR 000098.

- "Similarly, in response to comments noting the lack of scientific support for imposing an elevation limit on OSV use, the Forest Service responded that 'the 5,000-foot elevation was in no way a hardline requirement but rather an initial screening tool to narrow our efforts to NFS lands most likely to receive snowfall in adequate amounts to support OSV use.'"  ECF No. 40 at 24; AR 000098.

The administrative record contains sufficient responses from the Forest Service to each of Plaintiffs' identified comments.  Indeed, the FEIS contains an extensive chart over one hundred pages long documenting the comments received and the agency's appropriate responses to those comments.  *See* AR 000032–141.  Plaintiffs' briefing, while framed as a critique on the Forest Service's alleged failure to consider and respond to comments received, is more properly understood as another attack on the

1  underlying argument that this Court has already addressed – that Plaintiffs disagree

2  with the 5,000-feet and twelve-inch thresholds applied by the Forest Service because

3  it limits the geography available to Plaintiffs to utilize OSVs. (*See, e.g.*, ECF No. 40 at

4  24 ("The Forest Service did not explain how the 5,000-foot cutoff was determined nor

5  did it provide any evidentiary support for that determination. What response the

6  agency did offer is circular and non-substantive".).) The Court concludes that the

7  Forest Service complied with its obligations to identify and respond to comments

8  received.

9      **IV.    Environmental Impacts**

10     Plaintiffs' next argument is that the Forest Service failed to adequately consider

11 environmental impacts in violation of NEPA and the Travel Management Rule ("TMR").

12 (ECF No. 40 at 25–33.) This argument has three subparts: (1) the Forest Service failed

13 to use adequate scientific information in its effects evaluation in violation of NEPA; (2)

14 the Forest Service's application of the Travel Management Rule's minimization criteria

15 was arbitrary and capricious as to the prescription to minimize harassment of wildlife;

16 and (3) the Forest Service failed to sufficiently analyze and support site-specific

17 conclusions to exclude areas from OSV use.

18     NEPA requires that federal agencies take a "hard look" at all direct, indirect,

19 and cumulative impacts of their proposed actions. *N. Plains Res. Council, Inc.*, v.

20 *Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011). "Taking a 'hard look'

21 includes 'considering all foreseeable direct and indirect impacts'" and "'should involve

22 a discussion of adverse impacts that does not improperly minimize negative side

23 effects.'" *League of Wilderness Defs.-Blue Mountains Biodiversity Proj. v. U.S. Forest*

24 *Serv.*, 689 F.3d 1060, 1075 (9th Cir. 2012) (quoting *N. Alaska Envtl. Ctr. v. Kempthorne*,

25 457 F.3d 969, 975 (9th Cir. 2006)).

26     Likewise, under the TMR, the Forest Service is tasked with carefully considering

27 the environmental effects of designating roads, trails, and areas for motorized use. 36

28 C.F.R. § 212.55. This includes, but is not limited to, analyzing how designating roads,

1    trails, and areas for motorized use may impact wildlife, native vegetation, and soil

2    quality.  *See id*.  The TMR requires the Forest Service to consider and apply specific

3    criteria with the objective of minimizing damage to forest resources, harassment of

4    wildlife, disruption of wildlife habitat, and conflicts between motor vehicle use and

5    existing or proposed recreational uses of the Forest.

6        **A. Sierra Nevada Red Fox Effects Evaluation**

7        The Decision closes the Sonora Pass area to OSV use after April 15 each year to

8    protect the Sierra Nevada Red Fox from coyote predation that may be exacerbated by

9    OSV usage.  AR 000011–12.  Plaintiffs challenge this closure on the basis that the

10   Decision overstates the risk of coyote predation to the Sierra Nevada Red Fox that

11   may be facilitated by OSV use.

12       As a necessary preliminary matter, the Forest Service contends that Plaintiffs'

13   arguments regarding the Sierra Nevada Red Fox are waived.  (ECF No. 42 at 20.)  The

14   Forest Service argues that "Plaintiffs did not challenge the Forest Service's analysis of

15   OSV impacts to Sierra Nevada red fox during the administrative process, and they

16   have waived this argument." (*Id.*)  The Court agrees.  *See Appalachian Power Co. v.*

17   *EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) ("It is black-letter administrative law that

18   absent special circumstances, a party must initially present its comments to the agency

19   during the rulemaking in order for the court to consider the issue.") (internal

20   quotations omitted).

21       Plaintiffs point to two comments and one objection letter submitted to the

22   Forest Service that they argue directly invoke the relationship between the Sierra

23   Nevada Red Fox, coyotes, and OSVs.  The first comment identified by Plaintiffs, AR

24   005634–35, submitted by Sierra Snowmobile Foundation, tenuously links coyotes to

25   OSV usage, but does not otherwise put the Forest Service on notice regarding effects

26   on the Sierra Nevada Red Fox.  (*See* ECF No. 43 at 21.)  The comment identifies a

27   study, *The effect of snowmobile trails on coyote movements within lynx home ranges*,

28   and summarizes that article with the quote: "The overall influence of snowmobiles on

1  coyote movements and foraging success during winter appeared to be minimal on
2  our study area."  AR 005635.  That study is not attached for the Court, and the Court
3  cannot conclude from the article's name, which appears to concern lynxes, that the
4  comment fairly put the Forest Service on notice that there was a scientific basis for
5  concluding that there are minimal interactions between coyotes, the Sierra Nevada
6  Red Fox, and OSV usage.

7       The second letter, AR 004548, submitted by Jeff Whittman of Sierra Veterinary
8  Care, challenges any relationship between trails left by OSV usage and coyote
9  predation, providing anecdotal evidence that in Whittman's "30 plus years in the high
10 country, [he has] never ever seen a coyote let alone one walking on a snowmobile
11 trail."  (*See* ECF No. 43 at 21.)  But that anecdotal evidence is not enough to put the
12 Forest Service on notice that there is a meaningful dispute as to any relationship
13 between coyotes, the Sierra Nevada Red Fox, and OSV usage.  And finally, Plaintiffs
14 rely on an objection letter submitted by the Sierra Snowmobile Foundation.  That
15 objection letter (which the Court notes is not a comment and therefore not a proper
16 vehicle to lay the groundwork for contesting a rulemaking in federal court), AR
17 004408, submitted by Kevin Bazar in response to the FEIS, as relevant, states:
18 "Seasonal closure of the Sonora Pass area . . . offers no meaningful protection of Sierra
19 Nevada Red Fox."  It does not discuss coyotes, nor does it meaningfully link or delink
20 the Sierra Nevada Red Fox to OSV usage.

21      While it is true Plaintiffs need not provide "magic words" in their submissions to
22 the Forest service, *see Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 966 (9th
23 Cir. 2002), those submissions must meaningfully "alert[] the agency to [Plaintiffs']
24 position," *Department of Transportation. v. Public Citizen*, 541 U.S. 752, 764 (2004).
25 Here, the submissions identified by Plaintiffs cannot be said to provide sufficient
26 notice to the Forest Service that there is meaningful debate regarding the relationship
27 between coyotes, the Sierra Nevada Red Fox, and OSV usage.  By failing to
28 substantively raise this issue during the comment period, Plaintiffs have waived their

1    argument related to effects evaluation pertaining to the Sierra Nevada Red Fox.  *See*

2    *Marathon Oil Co. v. United States*, 807 F.2d 759, 767–68 (9th Cir. 1986).

3    **B.  Hard Look at Specific Species**

4    **i.  Sierra Nevada Red Fox and Pacific Marten**

5    Intervenor Defendants separately challenge the Forest Service's evaluation of

6    environmental effects on the Sierra Nevada Red Fox and Pacific Marten, arguing that

7    the agency failed to comply with NEPA's "hard look" requirement when assessing

8    OSV impacts on the species.  The Sierra Nevada Red Fox is listed as endangered

9    under the Endangered Species Act, and at the time of the filings, had a breeding

10   population of approximately twenty-one individuals.  AR 004090; AR 000541.  There is

11   no meaningful dispute that the species is "on the brink of extinction."  (*See* ECF No. 41

12   at 18.)  The Pacific Marten is listed as a "sensitive species" under the Endangered

13   Species Act and a "species of special concern" under California law.  (*Id.*)  OSV usage

14   can impact both species through snow compaction that facilitated habitat intrusion by

15   predators and competitors (including coyotes), as well as through disturbance and

16   displacement of individuals from preferred habitat, direct injury or mortality, or habitat

17   alteration and fragmentation.  AR 000533; AR 000537; AR 000542–43.  Intervenor

18   Defendants allege that the Forest Service did not adequately identify and disclose the

19   location of Sierra Nevada Red Fox and Pacific Marten occupied and suitable habitat

20   and where that habitat overlaps with OSV use designations.  (ECF No. 41 at 18.)

21   The Forest Service, in assessing effects on the Sierra Nevada Red Fox, identified

22   general potential threats including both natural ones (e.g., disease, predation, etc.),

23   and unnatural (e.g., harm from vehicles, etc.).  AR 000541.  The FEIS also explicitly

24   identified the Sonora Pass and Lassen groups of Sierra Nevada Red Foxes, and OSV

25   impacts on those populations.  AR 000541–42.  Intervenor Defendants, believing that

26   occupied and suitable habitat in relation to OSV usage should be looked at more

27   closely, frame the Forest Service's approach in declining to identify the specific habitat

28   of the Sierra Nevada Red Fox and Pacific Marten (as opposed to the more general

1   areas in which they are found) as insufficient to properly assess the harm to the

2   species.

3       But the Forest Service's obligations under NEPA are purely procedural; the

4   actual substantive results of that procedure, even when a conclusion is fairly

5   contested, do not automatically render the results improper if the proper procedural

6   requirements were satisfied.  *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*

7   *Colorado*, 145 S. Ct. 1497, 1507 (2025) ("NEPA imposes no substantive environmental

8   obligations or restrictions.  NEPA is a purely procedural statute . . .).  Further,

9   Intervenor Defendants identify no binding precedent, and this Court is unaware of

10  any, that requires the Forest Service to assess specifically occupied habitat when

11  weighing impacts on a species (either at all, or to the extent preferred by Intervenor

12  Defendants).  In the Court's view, the extensive discussion in the FEIS regarding

13  impacts to Sierra Nevada Red Fox, including discussion regarding occupied and

14  suitable habitat and the impacts of OSV usage on that habitat, satisfies NEPA's

15  procedural requirements.  *See* AR 000541–42 (documenting Sierra Nevada Red Fox

16  occurrences in Stanislaus National Park, specifically within the Lassen Peak and Sonora

17  Pass regions); AR 000542 (acknowledging direct and indirect threats that from OSV

18  usage that includes "[d]isturbance to foraging behavior, reproduction, or general

19  movement" and increases in coyote infiltration of fox habitat caused by OSV snow

20  compaction).

21      Intervenor Defendants further contend that the Forest Service did not account

22  for comments submitted by the Central Sierra Environmental Resource Center

23  ("CSERC").  (ECF No. 41 at 19.)  That data, Intervenor Defendants argue, was raised to

24  the Forest Service and shows interaction between OSVs and known Sierra Nevada

25  Red Fox habitat, but was not included in the administrative record (although it is

26  referenced in several documents within the administrative record).  (*Id.*)  The Court

27  cannot comment on the specific data of CSERC's comments because those data are

28  not before the Court (nor would the Court be the appropriate entity to weigh that

1    data).  But in reviewing the documents in the administrative record that reference

2    CSERC's data, it appears that those parties challenging the Forest Service's action

3    disagree with the agency's conclusions after reviewing the data provided by CSERC,

4    rather than take issue with an alleged failure to consult that data in the first instance.

5    For example, AR 004313, an objection letter submitted by CSERC, critiques the Forest

6    Service for "not accurately address[ing] the focus of wildlife comments or the true

7    nature of potential adverse effects."  That is, CSERC's concern in the objection letter is

8    with how the Forest Service interpreted available data, not whether the Forest Service

9    acknowledged the data.  And in AR 005235, a comment letter submitted by CSERC,

10   CSERC simply references that it has provided the Stanislaus National Forest wildlife

11   biologists with photo evidence of Sierra Nevada Red Fox and Pacific Marten in

12   proximity to areas slated for OSV access.  But on AR 005236 (the next page), CSERC

13   again attacks the Forest Service's conclusions, arguing that it would be "disingenuous"

14   for the Forest Service to permit that OSV usage in light of the data in front of the

15   agency.  In other words, CSERC attacks the substance of the Forest Service's

16   conclusions after having access to relevant data, rather than its procedure.  But as

17   emphasized above, NEPA is a purely procedural statute.  *See Seven Cnty.*

18   *Infrastructure Coal.*, 145 S. Ct. at 1507.  Whether the Forest Service's conclusions here

19   are misguided is not a question for the Court. The Court is obligated to enforce those

20   conclusions if they satisfy NEPA's procedural requirements and are sufficiently

21   supported, which the Court finds they do.

22       Next, Intervenor Defendants argue that the Forest Service improperly assumed

23   that OSV use did not occur regularly in Pacific Marten area habitat.  (*See* ECF No. 41 at

24   20.)  Intervenor Defendants assert that the Forest Service did not acknowledge public

25   comments from Plaintiffs indicating that OSV usage occurred in tree-covered slopes

26   (which include Pacific Marten habitat), nor did it consider that recent wildfires have

27   created openings for new OSV usage in "once forested areas."  (*Id.*)  But the FEIS's

28   discussion of OSV use does in fact acknowledge that OSV usage can occur in both

1    tree-covered and treeless areas.  AR 000533 (noting that OSV usage occurs in areas

2    with "canopy cover less than 70 percent" and in areas with "canopy cover less than 30

3    percent").  And as the Forest Service points out, "once forested areas" are not

4    reasonable candidates for Pacific Marten habitat because there is no longer canopy

5    cover.  (ECF No. 42 at 31.)  So even if forest fires are creating access to new areas for

6    OSV use, those areas themselves would not likely house Pacific Marten.

7          Intervenor Defendants further assert that the Forest Service failed to adequately

8    consider impacts to Sierra Nevada Red Fox in the Sonora Pass OSV play area.  (ECF

9    No. 41 at 20.)  More specifically, Intervenor Defendants argue that the Forest Service

10   failed to account for "likely den sites" and incorporate that analysis into the greater

11   discussion regarding OSV usage and Sierra Nevada Red Fox interactions, given the

12   species' diminished population numbers.  The Decision allows for OSV use in the

13   Sonora Pass area through April 15.  The core population of endangered Sierra

14   Nevada Red Fox is found in the Sonora Pass area.  AR 000540–41.  Intervenor

15   Defendants believe that the decision to limit OSV use in Sonora Pass through only

16   April is "based on inaccurate and misleading information and fails to consider

17   important direct and indirect impacts, thus rendering it arbitrary and capricious."  (ECF

18   No. 41 at 20.)  Intervenor Defendants point to June 30 as a more appropriate end

19   date.  (*Id.* at 23.)

20         To the contrary, the FEIS extensively discusses impacts on Sierra Nevada Red

21   Fox habitat and identified the location of the Fox's populations.  Although the Sierra

22   Nevada Red Fox breeds year-round, the FEIS explains that its decision to limit OSV

23   usage after April 15 "will ensure that OSV use does not overlap with the majority of the

24   [Fox's] denning period and will minimize the risks of OSV use disturbing den

25   establishment or facilitat[ing] disturbance of predation of emerging pups."  AR

26   000374.  Intervenor Defendants also take issue with the Forest Service's alleged lack

27   of attention to potential increases in OSV activity in Sonora Pass as other areas are

28   closed and related impacts on  nighttime activities of the Fox.  (ECF No. 41 at 21.)  But

1    the record confirms that the Forest Service did indeed consider these factors.  For

2    example, the FEIS notes that OSV use is restricted by other factors such as

3    "ungroomed high elevation terrain," supporting the agency's conclusion as to when it

4    is appropriate to permit or not permit OSV usage in the area.  *See* AR 000234.  And

5    further, the FEIS explains that nocturnal Sierra Nevada Red Fox activities do not carry a

6    great risk of being impacted by OSV usage because most OSV usage occurs during

7    the daytime.  *See* AR 016131.  Finally, Intervenor Defendants argue that the Forest

8    Service improperly minimized impacts on the species, given that the species' minute

9    population numbers would make any impact on a single individual felt more broadly

10   across the species.  (ECF No. 41 at 23.)  But the FEIS acknowledges this very issue: at

11   AR 000542, the FEIS directly discusses the "small and isolated nature" of the Sierra

12   Nevada Red Fox and accordingly how impacts from OSV use "have a higher

13   likelihood" of impacting the species.  And while the April limit for OSV access may be

14   imperfect in Intervenor Defendants' eyes, it is the result of a reasoned analysis by the

15   Forest Service that attempts to balance both OSV recreational use and environmental

16   protection.  *See* AR 000374 (acknowledging those competing interests).  Again,

17   Intervenor Defendants take issue with the Forest Service's conclusions, which the

18   agency has arrived to after complying with NEPA and considering the appropriate

19   information before it.  The Court cannot impose additional substantive requirements

20   beyond what NEPA requires.

21        The Court finds that the Forest Service sufficiently examined the information

22   before it to substantiate its conclusions regarding OSV access to Sonora Pass and

23   other areas.  Whether those conclusions are perfect is beyond the scope of the Court.

24              **ii.   Sierra Nevada Yellow-Legged Frog and Yosemite Toad**

25        Intervenor Defendants also point to two additional species impacted by OSV

26   usage in the Forest: the Sierra Nevada Yellow-Legged Frog, which is listed as

27   endangered, and the Yosemite Toad, which is listed as threatened.  (ECF No. 41 at

28   24.)  OSV usage harms these species through collisions, noise disturbance, damage to

1    vegetation, snow compaction, and chemical pollution.  AR 000497–99.  Intervenor

2    Defendants assert that the Forest Service failed to take a "hard look" at the

3    effectiveness of its mitigation measures on these species.  (ECF No. 41 at 24.)

4        The record indicates that the Forest Service extensively analyzed impacts on

5    both species, satisfying NEPA's "hard look" requirement.  For example, the FEIS

6    specifically discusses how the Sierra Nevada Yellow-Legged Frog is typically not

7    directly impact by OSV use because the Frog spends the winter months in "deep lakes

8    or pools with undercut banks that provide cover," and that the Frogs typically "breed[]

9    after the spring that period," meaning there are limited interactions with OSVs or their

10   effects.  *See* AR 000504.  That is, the FEIS examines the effects on the Frog and

11   reaches specific conclusions as to what level of OSV contact is appropriate.  The FEIS

12   provides a similar level of assessment for the Yosemite Toad.  The FEIS specifically

13   identifies where the Toad is located, what kinds of habitat support it, where critical

14   habitat is located, and what the effects of OSV usage are on the species.  The FEIS

15   explains that Yosemite Toads hibernate during the brunt of the OSV season,

16   inherently limiting contact between the species and OSVs.  *See* AR 000508.  The FEIS

17   then examines the threats facing the species from OSV use and notes that there would

18   be "minor" amounts of disturbance under a twelve-inch minimum snow depth.  *Id.*

19       The Court concludes from the FEIS' discussion on these species that the Forest

20   Service satisfied its procedural requirements under NEPA.  The FEIS identifies the

21   threats facing the species and reasonably provides a basis for the protections

22   implemented by the Forest Service.

23       **C.  Application of the Travel Management Rule's Minimization Criteria**

24       Plaintiffs seek to build on their previous concerns regarding "unsupported

25   assumptions on coyote predation of red foxes," by incorporating an allegation that the

26   Forest Service misapplied the Travel Management Rule's criteria to minimize

27   harassment of wildlife.  (ECF No. 40 at 30.)  The Forest Service contests both whether

28   Plaintiffs can procedurally bring these claims, and the merits of the claims themselves.

1   (ECF No. 42 at 23.)  As with Plaintiffs' claims regarding the effects on the Sierra

2   Nevada Red Fox, *infra* at pages 20–22, Plaintiffs' allegations rely on a mere two public

3   comments and an objection to the FEIS.  But as discussed, these comments do not

4   properly put the Forest Service on notice that Plaintiffs had a meaningful concern

5   regarding the Forest Service's findings on the relationship between coyotes, the Sierra

6   Nevada Red Fox, and OSV usage.  For the reasons already discussed, the Court views

7   Plaintiffs' claims as yielded for failure to raise them during the rulemaking process.

8   *See Marathon Oil Co. v. United States*, 807 F.2d at 767–68.

9       **D. Site-Specific Conclusions and the Exclusion of Areas from OSV Usage**

10          Plaintiffs next allege that the Forest Service failed to sufficiently analyze and

11   support site-specific conclusions including the agency's decision to prohibit OSV use

12   in certain Near Natural areas and recommended wilderness areas.  (ECF No. 40 at 31.)

13   Plaintiffs point out that before the Decision, the Forest Service permitted cross-country

14   OSV use in the Forest wherever there was adequate snowfall in areas that allowed for

15   motorized use and in some Near Natural and Proposed Wilderness areas.  (*Id.*)  The

16   Forest Service responds that the final Record of Decision explains the agency's

17   pronouncement to exclude certain areas, specifically the Pacific Valley and

18   Eagle/Night Near Natural Areas from OSV use.  (ECF No. 42 at 17–18.)  In Plaintiffs'

19   view, the Forest Service's conclusion is unsupported by the evidence before the

20   agency and therefore arbitrary and capricious.

21          Both parties point to this quote in the final Record of Decision from Forest

22   Supervisor Jason Kuiken explaining the determination:

23

24          Although I have not been persuaded that any evidence exists to
            definitively conclude that OSV use would or currently does significantly
25          impact sensitive wildlife, I admit I have not obtained evidence to
            definitively dispute such claims either. I believe that my team has clearly
26          identified the potential risks OSV use may pose to sensitive wildlife and
            they have designed management requirements or provisions included in
27          this decision to sufficiently minimize those risks. Despite our efforts to
            minimize impacts and document our considerations and findings,
28

concerns pertaining to designating certain proportions of Near Natural management areas for OSV use have persisted, particularly in the eastern portion of the Pacific Valley Near Natural area and within the Eagle/Night Near Natural area located along the northern rim of the Emigrant Wilderness. While new information may become available in the future which may sway my decision and more definitively support OSV use designations, at this time I have decided to [err] on the side of caution and reduce the acres designated for OSV use in the Pacific Valley and Eagle/Night Near Natural areas in order to mollify the persistent and growing wildlife concerns. I believe by doing so I will have designed a decision that will still provide consistent, high quality OSV use opportunities and best meet the purpose and need to first and foremost provide a manageable, designated system of OSV trails and areas within the Stanislaus National Forest while ensuring species specific impacts are reduced and protections ensured."

AR 00010. Plaintiffs fairly point out that this conclusion is somewhat contradictory of the Draft ROD's previous conclusion that: "Based on these analyses, [the Forest Supervisor] determined that there was a very low risk of potentially impacting sensitive wildlife species within these Near Natural areas and that the potential for these areas to be recommended for wilderness designation in the future would not be impacted." AR 000618. While the Court acknowledges that the Final ROD's conclusions depart from this previous quote, the Court does not view this contradiction as fatal. That is because the Forest Supervisor Kuiken's quote in the Final ROD explains his reasoning for reaching the new conclusion: that there is conflicting evidence as to the effects on wildlife and that he wanted to err on the side of caution. As mentioned earlier, at least one species within the Forest, the Sierra Nevada Red Fox, is quite literally on the brink of extinction. The Court views it as reasonable for Supervisor Kuiken to shift to prioritizing the region's wildlife in the face of data that supports multiple options.

Plaintiffs' argument that this shift "runs counter to the evidence before the agency" is disproved by the Kuiken quote above. (*See* ECF No. 40 at 33.) That is because Kuiken explicitly acknowledges that the evidence before him is split, and that it is precisely because of that split that he chose to change his conclusion and err on the side of caution in favor of wildlife. And there is data referenced in the record that

1  identifies the presence of already-discussed endangered species in the Pacific Valley

2  and Eagle/Night areas.  AR 005231 ("[M]artens are present in the Pacific Valley, Night,

3  and Eagle roadless areas."); AR 005235 (the Night roadless area "contains a proven

4  population of marten . . . plus it contains proven scat evidence of Sierra Nevada red

5  fox and is adjacent to acres with proven photo evidence of Sierre Nevada red fox.").[1]

6       Nor does this departure, as Plaintiffs argue, conflict with the Forest Service's

7  purpose and need for the project.  (*See* ECF No 40. At 33.)  As discussed earlier, the

8  project's underlying purpose is to "provide access, ensure that OSV use occurs when

9  and where there is adequate snow for that use to occur, promote the safety of all

10  users, enhance public enjoyment, minimize impacts to natural and cultural resources,

11  and minimize conflicts among the various uses of NFS lands."  AR 000309.  The

12  decision to restrict OSV use in certain locations aligns with this goal.  It allows OSV use

13  to continue in areas where the Forest Service is confident that there are minimal

14  environmental tradeoffs, and it protects the environment and natural and cultural

15  resources where the Forest Service has concerns.

16       The Court finds that the reasoning behind his shift in opinion is supported in

17  the Final ROD and is neither arbitrary nor capricious.

18  **V.    Using Adequate Scientific Information in Amending the Forest**

19       **Plan**

20       The Forest Service must use "the best available scientific information to inform

21  the planning process . . . for . . . developing, amending, or revising a plan."  36 C.F.R.

22  § 219.3.  Plaintiffs challenge the Forest Service's amending of the Final ROD to

23  incorporate the previously discussed twelve-inch snow threshold for OSV trails,

24  alleging that this change is not supported by the best available scientific information.

25  (ECF No. 40 at 34.)  But the Court has already addressed in detail its conclusion that

26  the Forest Service has met its requirements under NEPA in adding this threshold to

27  _____

28  [1] The Court notes that these citations in the administrative record reference data from CSERC.

1 the Forest Plan.  Therefore, Plaintiffs' claim here, which is a repackaging of its previous
2 arguments, must necessarily fail.

3 **CONCLUSION**

4   Plaintiffs' Motion for Summary Judgment (ECF No. 40) and Defendant

5 Intervenors' Motion for Summary Judgment (ECF No. 41) are DENIED in full.

6 Defendant Forest Service's Motion for Summary Judgment (ECF No. 42) is GRANTED

7 in full.  The Clerk of the Court is DIRECTED to enter judgment in favor of Defendant

8 Forest Service and CLOSE the case.

9
10   IT IS SO ORDERED.

11 Dated:   **August 28, 2025**

Hon. Daniel J. Calabretta
12 UNITED STATES DISTRICT JUDGE

16 DJC5-sierra221cv01913.msj